IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JUSTIN E. BARTLEY,

       Plaintiff,

v.                                              Civil Action No. 2:04cv39

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
       Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

*Pro se* Plaintiff, Justin E. Bartley, (Claimant), filed his Complaint on May 25, 2004 seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1] Commissioner filed her Answer on July 27, 2004.[2] Claimant filed his Motion for Summary Judgment on September 9, 2004.[3] Commissioner filed her Motion for Summary Judgment on October 28, 2004.[4]

B.    <u>The Pleadings</u>

      1.    <u>Claimant's Motion for Summary Judgment</u>.[5]

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 10.

[4] Docket Nos. 12 and 13.

[5] Docket No. 10.

    2.  Commissioner's Motion for Summary Judgment.[6]

C. Recommendation

  1. I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED. The ALJ was substantially justified in his decision. Specifically, Claimant's limitations do not meet or equal any Listing.

## II. Facts

A. Procedural History

 Claimant filed for disability insurance benefits (DIB) on January 9, 1991 alleging disability since January 1, 1991. Claimant was found disabled. A redetermination decision dated June 23, 1997 found Claimant no longer disabled as of June 1, 1997. On reconsideration the ALJ found Claimant disabled on September 9, 1998. Ultimately, Claimant's benefits were terminated due to excess income.

 On October 12, 2001 Claimant filed for Social Security Income (SSI) payments alleging disability since January 1, 1999. The application was denied initially and on reconsideration. A hearing was held on March 13, 2003 before an ALJ. The ALJ's decision dated April 22, 2003 denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on March 23, 2004. This action was filed and proceeded as set forth above.

B. Personal History

 Claimant was 18 years old on the date of the March 13, 2003 hearing before the ALJ. Claimant has an eighth grade education and is currently enrolled in classes to obtain his GED.

---

[6] Docket Nos. 12 and 13.

Claimant has experience washing windows and answering phones.

C. <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability January 1, 1991 - April 22, 2003:

**Dr. Gingold, M.D., 8/17/98, Tr. 198-199**
- Progressive difficulties with his Charcot-Marie Tooth Disease. It is unacceptable for him to have no assistance in terms of working on his work, both in school an at home.

**Dr. Clevenger, P.T., 9/3/98, Tr. 201**
- Still note some difficulty with more advanced balance activities and those that require good ankle strength and stability.
- Goals:
    - Increase PROM SLR R and L by 15 degrees.
    - Increase PROM and AROM B ankle DF by 5 degrees.
    - Able to heel walk x 3 feet.
    - No instability noted in ankles during exercises.
    - Goals to be achieved by end of school year - June 1999.

**Dr. Pitman, P.T., 11/17/99, Tr. 202**
- I am recommending outpatient therapy 2 to 3 times a week to continue to work on Justin's endurance, strength, balance, and orthotic management. Justin would also benefit from evaluation by as school PT and adaptive physical education classes to focus on endurance, strength, and balance under the supervision of the school physical therapist. I am recommending an orthotic follow-up with Dr. Biundo and Pete Merto from MOPC. I am not recommending a wheelchair at this time secondary to Justin's ability to walk 4500 feet in 15 minutes independently.

**Maternal & Child Health, 8/24/99, Tr. 204**
- 14 year old male with CMT with more weakness and more falling over the last three months.

**Barbour County Schools, 10/21/99, Tr. 206**
- Justin's mother indicates that the major problem is Justin's noncompliance and temper trantrums. Most of the problems begin when Justin does not get his way, or someone saying things about his walking disability or name-calling. His mother reports that the behavior has increased. Recent tooth disease has been progressively been getting worse. Methods that have been used in the past to manage Justin's behavior include time-out, physical restraint and counseling. His mother reports that the best way to handle his behavior even if only temporarily is to ignore him and leave him alone.

**United Hospital, 11/23/99, Tr. 208-209**

- Principal Diagnosis: Bronchospasm with respiratory distress.

**Gregory, PA-C**, **2/7/01, Tr. 215**
- Insomnia secondary to the depression. We are going to place him on Prozac 10 mg once a day for the next three weeks and will have him to return at that point. He will continue with counseling. We will see if he needs to have this dose increased.

**4/26/99, Tr. 216**
- Asthma, exacerbated by allergies. Will start him on Claritin Reditab 10 mg daily, Phenergan with codeine 1 to 2 teaspoons every 4 to 6 hours for cough and will continue the nebulizer treatments prn.

**1/25/98, Tr. 217**
- Mononucleosis. Resolving. Will start back to school. Return to the clinic if symptoms persist or worsen. Sports physical. See physical form.

**10/26/98, Tr. 218**
- Mono. Recommend that we keep him on Home Bound for at least the next four weeks. No physical activity for the next four to six weeks.
- Left otitis media. Patient was placed on a Z-pak**.** Will return to the clinic as scheduled.

**5/22/98, Tr. 219**
- Asthma, exacerbated by allergies. Will start Claritin Reditabs 10 mg daily for the next two weeks and then follow up with him at that time. Continue Maxair autohaler. See physical examination form for Summer camp.

**2/19/98, Tr. 220**
- Asthmatic bronchitis, sinusitis. Will increase nebulizer treatments to every four hours prn. Cefzil 250 mg b.i.d. for ten days. Has over the counter cough medications. Will use Prednisone 15/5 ml two teaspoons each day for three days, 1-1/2 teaspoons each day for three days and then 1 teaspoon each day for three days. Return to the clinic prn.

**Childhood Disability Evaluation**
**Dr. Osborne, D.O., 6/19/01, Tr. 223-229**
Impairment:   CHAROT-MARIE TOOTH DISEASE.
Insufficient evidence for disposition.
Explanation:   Failed to keep [illegible] for necessary medical evidence.

**United Hospital Discharge Summary, 9/19/01, Tr. 235**
- Viral Meningitis.

**Dr. Matic, M.D., 2/8/02, Tr. 239-240**
Pediatric Disability Examination:
- Charcot Marie Tooth Disease;

4

- Mild in coordination and difficulty walking as the result of #1.
- Previous frequent ear infections with ear tubes placed 4 times, now resolved.
- Bronchial asthma 2-3 times per year exacerbation.
- History of conduct defiance and adjustment disorder.

**Dr. Beidleman, Ph.D., 3/29/92, Tr. 242**
Psychological Evaluation: I.Q.     V     82     P. 77    FS 78

**Dr. Osborne, D.O., 8/30/02, Tr. 245**
- Impairments O.F., V.O., D.D.
- Charcot Marie Tooth Disease, asthma
- Impairment or combination of impairments is severe but does not meet, medically equal, or functionally equal the listings
- Domain evaluation - 3 less than marked, 3 no limitation

**Fairmont General, 2/15/93, Tr. 290**
- Post-operative diagnosis Otitis Media with effusion and obstructive tonsillar hypertrophy.

**WVU Radiology, 9/5/02, Tr. 314**
- Thoracic spine. No evidence for fracture or dislocation.

D.  Testimonial Evidence

### 1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 323-26, 328-29):

Q  Okay. Why did you drop out in the ninth grade?

A  I had gotten into some trouble in school. And it as either I'd go back into the court system or drop out. So, my mom said that she'd rather see me drop out of school than go back into the court system.

Q  Okay. What kind of problems were you having?

A  Not wanting to go to school. Not listening to teachers and not doing my homework.

5

*		*		*

Q	Okay. Mr. Bartley, why don't you tell me - - I know you've got Charcot Marie Tooth. Is that your biggest problem?

A	Yeah.

Q	Let's talk about that, first. Why don't you tell me about it and how it limits you - - what difficulties you have?

A	Well it limits me to what I can lift, how far I can walk and if I can - - the feelings in my fingers and in my toes and in my feet and that's, that's about it.

Q	Let me ask you this, when did you start using the wheel chair?

A	Last year. They told me that I needed it for - - if I was going to long - - walking any long distance.

Q	Do you use it, normally or regularly?

A	When - - if we go to the mall or something like that, where than be on my feet for a while, is when I, normally, use it.

Q	About how, how long can you go on your feet before you need to use the wheel chair?

A	It, it depends on if - - how long I was on my feet before. Sometimes, I can go, probably, about ten minutes before I have to sit down and rest or my knees will give out on me.

Q	So, for example, if you had the ability to, to go the mall or go anywhere, if you could rest every ten minutes, then you wouldn't need the wheel chair? Is that what you're saying?

A	Probably.

Q      Okay. Do you use it - - how many hours a week are you going to school?

A      Twelve hours a week is what I'm - - was what I need to keep my learner's permit.

Q      All right. And do you need your wheel chair at school?

A      No.

Q      You're getting your learner's permit for driving now?

A      Yeah. I have, I have it but it's expired so I have to take it over again.

Q      Okay. Why - - let me ask you why, why did you bring your wheel chair today?

A      I had - - I don't know. My mom put it in - - we had got it from - - in our garage where we had kept it.

Q      All right. You don't really need it for this hearing, though. Is that correct?

A      No.

Q      Okay. How often do you use it?

A      I, I don't know. It's whenever we have a (INAUDIBLE) - -

Q      Well, in the last, last month, how, how many times have you needed to use it?

A      None in the last month because I've been busy with school. And my mom's been busy with work.

Q      Okay. When you have problems walking, how would you describe the problems?

A      My legs - - like if I walk for a long - - for a period of time, my feet won't pick up off the ground and my knees and stuff give out on me.

Q      Is it like a, is it like a fatigue feeling or an un-coordination feeling or - -

A      Probably, un-coordination and a little fatigue.

Q      All right. Is that accompanied by pain or is it, is it not accompanied by pain?

A      It's not accompanied by pain.

*         *         *

Q      What other physical problems does that cause for you?

A      Just not being able to lift, like, heavy objects, like boxes that has cans or anything like that in it.

Q      How much can you lift before it gives you a problem?

A      Not very much. I'd say, probably, probably less than five pounds because I. I - - like a five pound barbell, I can't I can't even lift, lift it up.

Q      You have problems with a five pound dumbbell or barbell?

A      Yes.

Q      How about a gallon of milk?

A      I can, I can lift a gallon of milk.

Q      How about a ten pound pack - - sack of potatoes?

A      I can, can lift that as long as I'm not going - - as long as it's not having to be carried very far.

Q      Do you have any problem sitting, for example?

A      No. If I sit for a while, my - - it bothers my back and stuff. And I just go numb sometimes.

Q      So you need to get up and move around?

A      Some - - yeah, sometimes.

Q      Okay. Are you able to sit through class?

A      Yeah, because after we work for an hour or so then we can get a fifteen minute

break in between before we have to back to work and stuff.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 338-40):

Q	All right. Assume a hypothetical individual, claimant's age, education, no prior work experience. Assume this person is restricted a sedentary range of work, needs a sit, stand option. No climbing, no unprotected heights, no dangerous machinery. Relatively, clean air environment, routine, repetitive tasks, entry level work. Can work with things or people but shouldn't be required to have to respond to repeated requests for information from the public or supervisors, fellow employees. Also, no pushing or pulling with lower extremities. Also, no jobs that require more than occasional twisting of the, the wrists, such as, screwing off bottle caps. Person can handle objects but can't have a job that requires inordinate amount of hand strength, like gripping. For example, gripping cartons and having to move them from one side or the other - - to the other. And no temperature extremes, occasional stooping, kneeling, crouching and crawling. Is there work in the national or regional economy such a person could perform?

A	Yes, Your Honor. And I'll define the local, regional economy as twenty percent of all unskilled jobs, in the State of West Virginia, according to the Bureau of Labor and Statistics. There would be the work of an interviewer. In the local regional economy, there would be 35 jobs, in the national economy, 22,700 jobs. There would be the work of a surveillance system monitor. In the local, regional economy, that would be seven jobs, in the national economy, 5,461 jobs. There would be the work of an assembler. In the local, regional

9

economy, there would be 62 jobs, in the national economy, 103,800 jobs.

  Q  Are those jobs consistent with the Dictionary of Occupational Titles?

  A  Yes, Your Honor.

  Q  Hypothetical two is, assume a hypothetical individual with the same restrictions as above. This person is going to be off task twenty-five percent of the time or more due to the effects of fatigue and lack of coordination, in the hands and feet. Is there work such a person could perform?

  A  No, Your Honor. There would be no jobs for this hypothetical individual.

  ALJ  Mr. Bartley, any questions for Dr. Ostrowski?

  CLMT  No.

 E. Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

- Can lift a sack of potatoes. (Tr. 329).
- Builds models, plays on the computer for an hour. (Tr. 329).
- Plays video games. (Tr. 329).
- Can ride a bike. (Tr. 330).

## II. The Motions for Summary Judgment

A. Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that Claimant's impairments meet a Listing.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly determined that Claimant's impairments do not meet or equal any Listing.

B.  The Standards.

1.  Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.  Judicial Review. Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.  Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.  Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical

or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

     5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

     6.    <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

     7.  <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

     8.    <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

     9.    <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled,

the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.     Discussion

### 1. Listing

Claimant asserts that his limitations evaluated under § 416.926(a) equal an impairment in the Listing of Impairment in Appendix 1 to Subpart P. of Regulations No. 4 (same as those under Listing 101.03A). Commissioner counters that Claimant's impairments do not meet or equal a listed impairment.

Under §§ 416.920 and 416.924 "a determination must be made whether the child's impairments cause functional limitations which equal any of the listed impairments." (Tr. 19). "[S]ix domains of functioning . . . must be considered: 1) Acquiring and using information; 2) Attending and completing tasks; 3) Interacting and relating to others; 4) Moving about and manipulating objects; 5) Caring for yourself, and 6) Health and physical well-being." (Tr. 20). "The degree of limitation in each area is quantified as extreme, marked, less than marked or no evidence of limitation." (Tr. 20). "A child with one extreme limitation or two marked limitations in the designated areas will be found to functionally equal the listed impairments." (Tr. 20). The ALJ

13

evaluated Claimant's impairments in accordance with the six domains of functioning. (Tr. 20-22).

1) Acquiring and using information. Based on Claimant's borderline intellectual functioning; his participation in a regular classroom, a teacher's opinion that Claimant's cognitive functioning was age-appropriate and did not noticeably interfere with his academic success, and Claimant's testimony that he is pursuing his GED and driver's education; the ALJ properly determined that Claimant has a less then marked limitation in acquiring using information. (Tr. 20-21, 135-40, 242-44).

2) Attending and completing tasks. Based on an examining psychologist's report that Claimant was cooperative and that there were no indications of any perceptual disturbance, mental content symptoms, or cognitive confusion; and Claimant's ability to watch movies and the discovery channel, play computer and play station games, read science fiction and Harry Potter books; the ALJ properly determined that Claimant has no degree of limitation in attending and completing tasks. (Tr. 21, 242-44, 168-76).

3) Interacting and relating to others. Based on Claimant's history of oppositional defiant disorder with no record of ongoing significant symptoms regarding this condition, Claimant's disruptive behavior in school and sometimes failure to follow class rules, a clinical review that Claimant appeared to be in good psychological control, and Claimant's mother's statements that Claimant was doing better, was not in any trouble, participates in Boy Scouts, participates in muscular dystrophy events, and participates in the church choir; the ALJ properly determined that Claimant has a less then marked limitation in interacting and relating to others. (Tr. 21, 140, 242-44, 181-88).

4) Moving about and manipulating objects. Based on Claimant's neurological disorder that results in distal weakness and loss of strength, Claimant's involvement in physical and occupational

therapy, Claimant's lack of motivation in therapy to utilize assistive devices such as ankle fixation orthotics or crutches as recommended, and Claimant's ability to dance, swim, ride a bike, operate video controls, use the computer, and build models; the ALJ properly determined that Claimant has a less than marked limitation in moving about and manipulating objects. (Tr, 21, 306-14, 239-41, 253-79, 153-61).

5) Caring for yourself. Based on Claimant's management of his basic self-care activities, Claimant's ability to cook a meal and microwave things, Claimant's preparation for his driver's license, Claimant's ability to care for his dog and his performance of household chores such as taking out the trash; the ALJ properly determined that Claimant is not limited in Caring for himself. (Tr. 21, 315-18, 153-61, 168-72).

6) Health and well being. Based on Claimant's functioning with his present treatment regimen, Claimant's condition being continually monitored with no required medication, and no record of any recent hospitalization; the ALJ properly determined that Claimant is not limited in health and well being. (Tr. 21-22).

Based on the above the ALJ correctly determined that Claimant's Charcot-Marie-Tooth disease and borderline intellectual functioning do not cause any marked or extreme limitations. Therefore, the ALJ properly determined that Claimant's impairments do not equal any of the listed impairments.

## 2. Impairment

Claimant asserts that he still has Charcot-Marie-Tooth Disease. The ALJ did not dispute this point. The ALJ concluded that "claimant has Charcot-Marie-Tooth disease and borderline intellectual functioning that affect his ability to function but do not cause any marked or extreme

limitations." (Tr. 22). Based on the above, the ALJ properly determined that Claimant's impairments do not meet or equal any Listing.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED. The ALJ was substantially justified in his decision. Specifically, Claimant's limitations do not meet or equal any Listing.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: April 28, 2005

/s/ James E. Seibert

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE